IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BETHANIE ELAINE PETERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:11-CV-1100-WKW |
| | ) | [WO] |
| HEALTHSOUTH OF DOTHAN, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Bethanie Elaine Peters brings this action to recover for the allegedly illegal disparate treatment and retaliation she suffered as an employee of Defendant HealthSouth of Dothan, Inc.[1] HealthSouth filed a motion for summary judgment (Doc. # 16), which has been fully briefed (Docs. # 17, 38, 39; *see also* Docs. # 40, 42, 43 (disputing the admissibility of two exhibits to Ms. Peters's response)). After careful consideration of the arguments of counsel and the relevant law, summary judgment is due in HealthSouth's favor.

**I. JURISDICTION AND VENUE**

Jurisdiction is proper under 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested.

---

[1] Although HealthSouth is a large organization, only the subsidiary HealthSouth of Dothan, Inc., is a defendant in this action.

## III.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing that the nonmovant has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–24.  "[T]he court must view all evidence and make all reasonable inferences in favor of the [nonmovant]." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Rule 56(e)(2).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine factual dispute exists if "a reasonable jury could return a verdict

for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Bethanie Elaine Peters is a white female who worked for Defendant HealthSouth of Dothan, Inc., as a rehab nurse liaison. As a rehab nurse liaison, Ms. Peters was responsible for gaining patient referrals and marketing HealthSouth's services to the medical community. Debra Leake, a black female, was another rehab nurse liaison who worked with Ms. Peters. Will Craig, a black male working as HealthSouth's director of marketing operations, supervised Ms. Peters and Ms. Leake, along with several other rehab nurse liaisons.

The way Ms. Peters tells the story, Mr. Craig got along better with Ms. Leake than with any of his white subordinates (including Ms. Peters). Although Mr. Craig often joked with Ms. Leake, he allegedly took a hateful and demeaning tone with his white subordinates. White employees like Ms. Peters had to formally request time off and explain why they needed it. Ms. Leake took time off whenever she wanted, and Mr. Craig would sometimes cover her workload while she was away. Ms. Leake would speak to her coworkers "in a mocking tone," but Mr. Craig would not punish her. (Doc. # 38.) According to Ms. Peters, Mr. Craig would never have tolerated such behavior from a white employee.

Further, Mr. Craig and Ms. Leake were both known to make racially charged comments while they were at work. Mr. Craig, for example, once speculated that a black pastor charged with molestation was being picked on because of his race, and Ms. Leake once congratulated a black coworker with eighteen grandchildren by saying, "You go sister you keep our race going." (Doc. # 38, at 16.)

Ms. Peters first complained about Mr. Craig and Ms. Leake on June 28, 2010. Earlier that day, Mr. Craig had accidentally called Ms. Peters's phone. When Ms. Peters took the call, she overheard Mr. Craig (who was unaware Ms. Peters was on the line) speaking angrily to someone and using a vulgar word in the process. Ms. Peters complained to Margaret Futch, the CEO of HealthSouth, both about the call and about the favoritism Mr. Craig showed to Ms. Leake. Ms. Peters admits that she "did not specifically state that what was going on was race discrimination" when she made this complaint. (Doc. # 22 ¶ 9.)

Ms. Peters next complained to Lydia Christian, HealthSouth's human resources director. On October 25, 2010, Ms. Christian counseled Ms. Peters about reportedly excessive absenteeism. During that meeting, Ms. Peters complained that Mr. Craig held white employees to a different standard than he did Ms. Leake. This time, Ms. Peters alleged that racial discrimination was to blame. Ms. Peters left that meeting believing she was on probation for excessive absenteeism, and later that day her

4

supervisor called to schedule an evaluation. The stress was too much to bear, and Ms. Peters crashed her car into a pole while she drove to her evaluation.

That day, Ms. Peters went on medical leave to recover from her physical and psychological injuries. She returned to work on November 3, 2010, and the next day she met with Ms. Christian. At that meeting, Ms. Christian let Ms. Peters know that the disciplinary measures for excessive absenteeism had been downgraded to verbal counseling. Unsatisfied that her complaint had been adequately addressed, Ms. Peters renewed her complaints about Mr. Craig and Ms. Leake.

Ms. Peters again complained about Mr. Craig and Ms. Leake's behavior during her employee evaluation, which took place on November 12, 2010. After the evaluation, Mr. Craig immediately began discussing Ms. Peters's evaluation with other employees. According to Ms. Peters, Mr. Craig was very angry after the evaluation, yelling at Ms. Peters in front of other employees. There is no evidence, however, that Mr. Craig mentioned Ms. Peters's complaints of discrimination in this tirade.

On November 19, 2010, a run-in with CEO Futch caused Ms. Peters enough stress to take a medical leave from November 12, 2010, to February 14, 2011. While Ms. Peters was on leave, two of her coworkers (both white) covered for her. After Ms. Peters returned, her referral numbers were down, compared both to her own

5

numbers from the previous year and the number of referrals her replacements secured during her absence. Ms. Peters takes issue with the manner in which HealthSouth calculated her referrals, but there is no evidence anyone else's referrals were calculated differently. On May 3, 2011, Ms. Peters was placed on probation for her low referral numbers.

On June 29, 2011, Mr. Craig called Ms. Peters and ordered her to submit a quarterly marketing plan before day's end.[2] Upon learning that Ms. Peters was scheduled to leave at noon that day, Mr. Craig offered to cover her other work so she would have time to complete the marketing report. Ms. Peters declined that offer and returned to the office, where she found a blank marketing-plan form on her desk. Ms. Peters wrote three items on the form and left it on her desk, labeled with a sticky note. CEO Futch did not think that qualified as turning in a completed marketing plan, and after a short investigation, Ms. Peters was fired "for not doing her marketing plan and not submitting it." (Doc. # 38, at 27.)

Six months later, Ms. Peters filed suit against HealthSouth in this court, alleging racial discrimination and retaliation in violation of Title VII of the Civil

---

[2] That morning, Mr. Craig also made a cryptic comment: "We'll get it next week." (Doc. # 38, at 26.) According to Ms. Peters's deposition testimony, she was not sure what to make of that comment. (Doc. # 18-2, at 136.) Neither is the court. At any rate, it is undisputed that Mr. Craig told Ms. Peters she needed to "come over and do her quarterly marketing plan" on June 29. (Doc. # 18-2, at 126.)

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.[3]  The matter comes before the court on HealthSouth's motion for summary judgment.

## IV.  DISCUSSION

Because Ms. Peters presents no direct evidence of racial discrimination or retaliation, her Title VII claims are governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008).  As a threshold matter, Ms. Peters's claims cannot survive summary judgment unless she creates an inference of discrimination or retaliation by establishing a *prima facie* case.  As the following discussion will show, Ms. Peters has failed to do so on all of her claims, so summary judgment is due in HealthSouth's favor.

**A.     Ms. Peters did not plead a claim for a racially hostile work environment.**

A substantial portion of the briefing on summary judgment is devoted to Ms. Peters's hostile work environment claim.  Ms. Peters, of course, argues that summary judgment is not proper on that claim – and in a way, she is right.

---

[3] As they relate to Ms. Peters's claims, both Title VII and 42 U.S.C. § 1981 "have the same requirements of proof and use the same analytical framework." *See Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998).  For the sake of brevity, this opinion will "explicitly address the Title VII claim with the understanding that the analysis applies to the §1981 claim as well." *Id.*

As HealthSouth points out, Ms. Peters's two-count complaint does not include a hostile-work-environment claim. Nor does it even mention the words *hostile work environment*. Instead, Ms. Peters initiated this lawsuit with a two-count complaint accusing HealthSouth of disparate treatment and retaliation. If Ms. Peters wanted to include a third count alleging HealthSouth fostered a racially hostile work environment, she certainly could have. But she did not.

A civil action commences when a party files a complaint with "a short and plain statement of the claim." Fed. R. Civ. P. 3, 8(a). A complaint that includes more than one claim for relief must set out each claim in a separate count when doing so would promote clarity. Fed. R. Civ. P. 10(b). Ms. Peters argues that certain *facts* in the complaint might support a hostile work environment claim. That may be, but the court is limited to consider only those claims that were actually pleaded. Thus, to the extent Ms. Peters argues summary judgment is improper on her hostile-work-environment claim, she is correct – but only because there is no such claim before the court. Instead, this opinion will address only the disparate treatment and retaliation claims Ms. Peters alleged in her complaint, and the court expresses no opinion on a racially hostile work environment. *See Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006) ("[D]iscussion of a potential claim in a deposition does not satisfy the requirement of Rule 8(a)."); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312,

1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

**B.     Ms. Peters has not established a *prima facie* case of racially-motivated disparate treatment.**

To establish a *prima facie* case of racially-motivated disparate treatment, Ms. Peters must show that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) HealthSouth treated similarly situated employees outside of her class more favorably, and (4) she was qualified to do the job. *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008). No one has argued that Ms. Peters does not belong to a protected class or that she was unqualified to do her job. Instead, HealthSouth argues that Ms. Peters has not pleaded an adverse employment action, and even if she has, she has not established that HealthSouth treated any similarly situated employee more favorably.

*1.     Ms. Peters pleaded an adverse employment action.*

Although Ms. Peters's complaint alleges a number of purportedly adverse employment actions she suffered due to her race, her brief only persists with one: Ms. Peters claims she was fired because of her race.[4] The phrasing of Ms. Peters's

---

[4] Ms. Peters's brief does list a number of other incidents under the heading "Statement of Facts" that she appears to believe show she endured racial discrimination at work. (*See* Doc. # 8, at 4–27.) In the argument section of her brief, however, Ms. Peters only identifies her

complaint may be inartful, but HealthSouth goes too far when it argues that "[n]owhere in Count One does Plaintiff allege that she was terminated because she is white." (Doc. # 17, at 27.) Count I of the complaint alleges that Ms. Peters was "deprived the opportunity to fill a position" as a "direct and proximate consequence of the race discrimination of which [she was] a victim." (Doc. # 1 ¶ 9.) While there are undoubtedly more straightforward ways Ms. Peters could have said she was fired because of racial discrimination, the phrasing she chose gets the job done.

### 2. *Ms. Peters has not identified a similarly situated individual HealthSouth treated more favorably than her.*

To say that Ms. Peters properly pleaded a claim for disparate treatment does not mean she has established a *prima facie* case. In order to survive summary judgment, Ms. Peters must submit evidence that HealthSouth treated similarly situated employees outside her class more favorably than her. Ms. Peters admits she was fired for failing to properly submit her quarterly marketing plan, which included only three

---

termination as an adverse employment action in support of her disparate treatment claim. (*See* Doc. # 38, at 37–56.)  At any rate, the omissions are likely an intentional response to HealthSouth's brief, which identifies fatal flaws in many of the arguments Ms. Peters implies but does not openly pursue.  For example, although Ms. Peters alleges she suffered discrimination in the allocation of leave, HealthSouth's undisputed evidence shows that Ms. Leake took only three weeks of leave compared to the thirteen weeks Ms. Peters took over the same period of time. (*See* Doc. # 17, at 23.)

10

items. But that reason must be a pretext, she argues, because Ms. Leake went unpunished for submitting a two-item marketing plan the preceding quarter.

Ms. Leake's circumstances, however, differ from those that got Ms. Peters fired in two important respects. First, Ms. Leake was not on probation for low referrals when she submitted a marketing plan that included only two items. HealthSouth may well have been justified in expecting a more robust plan from Ms. Peters, whose performance was struggling. But at any rate, a proper comparator would be one who was on probation when she submitted her quarterly marketing plan, and Ms. Leake does not fit the bill. Second, nothing in the evidence suggests Ms. Leake (or anyone else, for that matter) "turned in" her plan the way Ms. Peters did. Although Ms. Peters insists there was no special method for turning in marketing reports, she fails to offer any evidence that anyone in authority ever considered the method she chose acceptable.

To establish a *prima facie* case giving rise to an inference of racial discrimination, Ms. Peters must identify a similarly situated individual outside her protected class who was treated more favorably than her. Ms. Peters was on probation when her boss instructed her to complete a quarterly marketing plan before the day was out. In response, Ms. Peters came into work, wrote three items on a blank plan, placed it on her desk labeled with a sticky note, and left without a word.

HealthSouth, acting through its CEO (Mr. Craig was not involved in the termination decision (Doc. # 17 ¶ 41)), did not think those actions qualified as timely submitting a completed marketing report, and she fired Ms. Peters because of it.  There is no evidence that HealthSouth ever treated a similarly situated individual any differently, so Ms. Peters has failed to establish a *prima facie* case of disparate treatment.

**C.     Ms. Peters has not established a *prima facie* case of Title VII retaliation.**

To establish a *prima facie* case of retaliation, Ms. Peters must show that (1) she engaged in statutorily protected conduct, (2) she suffered an adverse employment action, and (3) the two were causally connected.  *Crawford*, 529 F.3d at 970.  Because Ms. Peters has not done so, her retaliation claim will not survive summary judgment.[5]

*1.     Ms. Peters's first complaint was not protected conduct.*

The first action Ms. Peters claims provoked illegal retaliation was her June 28, 2010, complaint to the CEO regarding Mr. Craig's preferential treatment of Ms. Leake.  But Ms. Peters admits she never mentioned racial discrimination when she made that complaint, and she presents no authority that suggests Title VII protects employees who complain of disparate treatment that is not tied to a protected trait.

---

[5] Again, Ms. Peters lists a number of incidents in the facts section of her brief that are not discussed in support of her retaliation claim.  This opinion will address each of the four complaints that Ms. Peters argues provoked illegal retaliation (*see* Doc. # 38, at 47–52).

Accordingly, Mr. Craig's alleged retaliation for that report does not violate Title VII because Title VII does not prohibit retaliation for unprotected conduct. *See Demers v. Adams Homes of NW. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) ("[T]o engage in protected activity, the employee must . . . at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred." (quotations omitted)).

### 2. *Ms. Peters has not shown a materially adverse employment action that was causally related to her other complaints.*

Next, Ms. Peters argues that her complaints on October 25, 2010, November 4, 2010, and November 12, 2010, provoked illegal retaliation. But even assuming those complaints were protected conduct, Ms. Peters has presented no evidence they provoked a materially adverse employment action.

Instead, Ms. Peters has only alleged that Mr. Craig and Ms. Leake teased her about her October 25 and November 4 complaints. According to Ms. Peters, Mr. Craig and Ms. Leake retaliated for those complaints by "making comments about how . . . the environment was hostile"[6] and "generally mocking and making fun" of her

---

[6] To be clear, there is evidence that Ms. Peters complained to her superiors of what she perceived to be a racially hostile work environment several times. Further, Ms. Peters's complaint does plead a count of retaliation, which can take the form of a retaliatory hostile work environment. *See Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012) (recognizing for the first time a retaliatory hostile work environment claim). But the fact remains that claims for a racially hostile work environment and those for a retaliatory hostile work environment are

13

complaints. (Doc. # 22 ¶ 14.) The November 12 complaint Ms. Peters lodged during her evaluation provoked a more spirited response: Mr. Craig, who was present at the evaluation, "discuss[ed] events that occurred in [the] evaluation with other employees and stat[ed] things as having been said which were not said." (Doc. # 38, at 50.) Immediately after the evaluation, Mr. Craig "was extremely angry" and "yell[ed] at" Ms. Peters. (Doc. # 38, at 50.) Ms. Leake looked on, laughing, and said "whoo-hoo this is a hostile work environment." (Doc. # 38, at 18.)

And then there was the pen incident. Less than a week after her evaluation, Ms. Peters went looking for "some of those good HealthSouth pens," which she wanted to give to a physical therapist at Flowers Hospital. (Doc. # 18-2, at 191.) When she found the drawer that usually contained hundreds of the good pens empty, Ms. Peters asked Mr. Craig where they all had gone. Mr. Craig responded by "hateful[ly]" informing Ms. Peters that Ms. Leake had taken all the pens. (Doc. # 18-2, at 192.) If Ms. Peters wanted some pens, she would have to ask Ms. Leake, because there was no room left in the budget to buy more pens. Much to the chagrin of Ms. Peters and her coworkers, Ms. Leake was apparently only willing to part with ten of the good pens. (Doc. # 18-2, at 193.) According to Ms. Peters, this incident

---

separate causes of action, and Ms. Peters only pleaded the latter.

was Mr. Craig's "demeaning and hateful" retaliation for the complaints of racism she lodged at her evaluation. (Doc. # 38, at 19.)

It is true, as Ms. Peters urges, that a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" can qualify as an adverse employment action in the context of a retaliation claim. *See Gowski*, 682 F.3d at 1312. It may even be true that the instances of "retaliation" Ms. Peters cites were petty and unmannered. But viewed in the light most favorable to Ms. Peters, they do not rise to the level of objective severity a Title VII claim for a retaliatory hostile work environment requires.

To evaluate the objective severity of the conduct Ms. Peters suffered, the court considers the totality of the circumstances, which includes, among other things, "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* at 1312. None of the conduct Ms. Peters has described was physically threatening, and she endured nothing more severe than a few mocking statements and a shouting match. Nothing in the evidence suggests the retaliatory conduct was particularly frequent. The only conduct that arguably interfered with

15

Ms. Peters's job performance was the pen incident, but there is no evidence that Ms. Peters's 2011 referral numbers were down due to insufficient access to the good pens in 2010.  The Eleventh Circuit has repeatedly held conduct far more egregious than that does not rise to the level of objective severity required to create a hostile work environment.  *See Kavanaugh v. Miami-Dade Cnty.* 775 F. Supp. 2d 1361, 1373 (S.D. Fla. 2011) (collecting cases).

Accordingly, Ms. Peters has not established a *prima facie* case of Title VII retaliation, and summary judgment is due in HealthSouth's favor on that claim.

## V.  CONCLUSION

It is therefore ORDERED that HealthSouth's motion for summary judgment (Doc. # 16) is GRANTED.  It is further ordered that, because the evidence HealthSouth challenged in its motion to strike does not alter the court's decision, that motion (Doc. # 40) is DENIED as moot.

A final judgment will follow.

DONE this 16th day of January, 2013.

                                               /s/ W. Keith Watkins
                                        CHIEF UNITED STATES DISTRICT JUDGE